```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,
                                           Criminal Action
4              Plaintiff,                  No. 1: 21-91

5          vs.                             Washington, DC
                                           September 26, 2023
6    CRAIG MICHAEL BINGERT - 1,
     ISAAC STEVE STURGEON - 2,             4:16 p.m.
7
               Defendant.
8    _____/

9
                   TRANSCRIPT OF SENTENCING
10       BEFORE THE HONORABLE ROYCE C. LAMBERTH
                UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:      KAITLIN KLAMANN
                             DOJ-USAO
14                           601 D Street NW
                             Washington, DC 20530
15
                             COURTNEY HOWARD
16                           U.S. ATTORNEY'S OFFICE FOR DC
                             601 D Street NW
17                           Washington, DC 20053

18   For Defendant Bingert:  ALLEN HOWARD ORENBERG
                             THE ORENBERG LAW FIRM, P.C.
19                           12505 Park Potomac Avenue
                             6th Floor
20                           Potomac, MD 20854

21

22             APPEARANCES CONTINUED ON NEXT PAGE

23

24

25
```

```
1                        APPEARANCES CONTINUED

2

3     For Defendant Sturgeon: MARIA JACOB
                               OFFICE OF THE FEDERAL PUBLIC DEFENDER
4                              625 Indiana Ave NW
                               Washington, DC 20004
5
                               EDWARD SMOCK
6                              OFFICE OF THE FEDERAL PUBLIC DEFENDER
                               District of Columbia
7                              625 Indiana Avenue NW
                               Suite 550
8                              Washington, DC 20004

9

10    Court Reporter:          SHERRY LINDSAY
                               Official Court Reporter
11                             U.S. District & Bankruptcy Courts
                               333 Constitution Avenue, NW
12                             Room 6710
                               Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  We are on the record in
3    criminal case 21-091, United States of America versus defendant
4    1, Craig Bingert; and defendant 2, Isaac Sturgeon.
5            Starting with the government, please approach the
6    podium and state your appearance for the record.
7            MS. KLAMANN:  Good afternoon, Your Honor.  Kaitlin
8    Klamann and Courtney Howard for the United States.
9            MR. ORENBERG:  Good afternoon, Your Honor.  Allen
10   Mr. Orenberg on behalf of Craig Bingert and accompanying
11   Mr. Bingert today are his parents.  His father is also named
12   Craig and Vanya Bingert.  They are in the second row in the
13   plaid shirt and the black top.
14           THE COURT:  Okay.
15           MR. ORENBERG:  Thank you.
16           MS. JACOB:  Good afternoon, Your Honor.  Maria Jacob
17   and Ned Smock on behalf of Isaac Sturgeon who is present here,
18   along with his parents in the first row, Mary and Steve
19   Sturgeon.
20           THE COURT:  Okay.
21           The first step will be to determine the guidelines.
22   So I will take the defendants' objections to the guidelines
23   first, starting with Mr. Bingert.
24           Were there any you wanted to make, other than those
25   made by Defendant Sturgeon?
```

1          MR. ORENBERG:  Your Honor, before the Court took the

2    bench, I discussed this with Ms. Jacob.

3          THE COURT:  I'm sorry.

4          MR. ORENBERG:  Before the Court took the bench,

5    Ms. Jacob and I discussed the order of presentation.  If the

6    Court would indulge us and let her go first.

7          THE COURT:  Okay.  Ms. Jacob.

8          MS. JACOB:  Your Honor, does it matter to the Court

9    where I start?  Would the Court like for me to address a

10   specific objection first?

11         THE COURT:  Yeah.  I have to determine the guidelines

12   before I can have you allocute on the sentence.  So I have to

13   make a determination of the guidelines first.

14         MS. JACOB:  Yes, Your Honor.  My apologies.  I meant

15   to ask, does the Court have a preference for the order of

16   objections that I --

17         THE COURT:  No.

18         MS. JACOB:  Your Honor, if that is the case, then I'd

19   like to start with the adjustment for the obstruction of

20   justice enhancement on behalf of Mr. Sturgeon.  We vehemently

21   object to that.  We -- there is no proof here that there were

22   items that were actually deleted by Mr. Sturgeon from his

23   phone.  The government's entire basis for suggesting this is

24   that he was holding up his phone at a very short period of time

25   and basically in the area -- the upper west terrace stairwell.

1    We have many different reasons that the Court is well aware of

2    why somebody would hold up a phone, doesn't take a photo or

3    video or deletes it right after, is blurry, doesn't like the

4    photo, is FaceTiming perhaps.  I mean, there are so many

5    different things that could have happened during those moments.

6         The government's own agent who testified at the trial

7    could not even conclude that that is what happened.  She was

8    very specific with her words.  Agent Chen said he appeared to

9    be holding up his phone, appeared to be taking a video -- or

10   she said he was possibly taking a video.  That is not enough

11   here, Your Honor.  That is not preponderance of the evidence.

12   And I think that language of even if -- even if he did take a

13   photo or a video, the language of United States guidelines

14   3C1.1, the application note is very clear that when dealing

15   with obstructive conduct prior to the start of the

16   investigation, two things must be present.  Must be

17   purposefully calculated and likely to thwart the investigation.

18        We know that these two things cannot be possibly true

19   even if he did take a photo, because we know that the biggest

20   factor that tells us that Mr. Sturgeon did not act willfully or

21   with the intent to thwart is that he actually consented to

22   handing over his phone that had so many incriminating videos,

23   messages, posts, personal text messages, none of which that he

24   deleted.  So it just wouldn't make sense, Your Honor, that he

25   would choose to delete, you know, one video with the purpose to

1    thwart.  Your Honor, it just doesn't add up.

2            Your Honor, the other thing is the likely to thwart

3    the investigation.  The Court knows how many body-worn camera

4    angles there were, how many CCTV angles there were.  And the

5    Court is well aware that regardless of whether he took a video

6    at that point or not, that everyone was privy to exactly what

7    happened there and exactly what was said there.

8            Now, 3C1.1 is specific that if the item is deleted,

9    if justice is obstructed during the investigation, that the

10   government must show he willfully obstructed or attempted to

11   obstruct.  They have not made this showing that Mr. Sturgeon

12   willfully did anything like that.

13           Your Honor, the last thing that I wanted to say about

14   this adjustment, is that, you know, the government had every

15   opportunity.  If they really, genuinely thought that he deleted

16   something with his phone, they could have put an expert up

17   there with a forensic extraction report.  That is -- it has

18   happened in many of my cases, unfortunately.  Where that is

19   very easy to identify if somebody has deleted messages on their

20   phone.  And the government has been quick to point that out

21   when it occurs.  And they didn't do that, Your Honor.  And they

22   had every opportunity to do so.  And I don't think they should

23   be -- I do not think that there is enough evidence here to

24   support what they are trying to say, especially based on the

25   fact that there is so many other incriminating photos and

1    messages that Mr. Sturgeon willfully handed over and cooperated

2    with.  Unless the Court has any questions about that specific

3    one, I can move on.

4              THE COURT:  Go ahead.

5              MS. JACOB:  Next is the adjustment for the official

6    victim enhancement under 3A1.2C1.  The government doesn't

7    really even state a basis for this contention that when using

8    the 2J1.2 guidelines, which is the highest producing guideline

9    here and that is the focus here, that we can then add an

10   additional 6 levels when there is already an 8 level

11   enhancement for the very same thing.  It hasn't been done in a

12   prior January 6 case that I am aware of.  It hasn't been done

13   by this Court that I am aware of.  And I think that just from a

14   common sense perspective, it just wouldn't make sense.  It

15   would be double counting to suggest that you give an 8 level

16   enhancement for threatening to cause injury or causing injury.

17             THE COURT:  But causing injury to a policeman is

18   different.

19             MS. JACOB:  Well --

20             THE COURT:  So the purpose of that enhancement is

21   different.

22             MS. JACOB:  Well, but if the conduct is the same, if

23   it is not a separate causing injury, and the conduct is the

24   same --

25             THE COURT:  It is not the same.

1          MS. JACOB:  So I am trying to understand the Court --

2          THE COURT:  The 8-point enhancement is causing the

3    injury.  The 6-point enhancement is causing an injury to a

4    policeman, isn't that the difference?

5          MS. JACOB:  It is the difference, Your Honor.

6          THE COURT:  So you do get an addition because you did

7    it to a policeman.

8          MS. JACOB:  If we are using the aggravated assault

9    guidelines then I think it applies.

10          THE COURT:  Right.

11          MS. JACOB:  In a case, not in this case, but in a

12    case where there was a danger -- a substantial risk of bodily

13    injury that is created.  But in this case where we are using

14    2J1.2, that is the highest producing guideline and the

15    enhancements for that guideline are specific to that offense,

16    then I don't think that we use the -- what applies to the

17    aggravated assault guidelines.  And if the Court will just

18    indulge me for a minute, I'd like to show the Court, you know,

19    a couple of exhibits that kind of further highlight this in

20    past cases and in this case in particular where even the

21    government during its plea negotiations recognized this.  That

22    the 6-level enhancement belongs to the aggravated assault

23    guidelines and the 8-level enhancement belongs to 2J1.2 and

24    they are not mixed together.

25          THE COURT:  You can do whatever.

1          MS. JACOB:  Okay.  Can the Court see what I just put

2     up on the screen?

3          THE COURT:  Yes.

4          MS. JACOB:  So this is the government's plea letter.

5     And this was a plea that was offered to Mr. Sturgeon in the

6     beginning of the case.  And as the Court can see on page 3 of

7     the plea letter, that they separate out --

8          THE COURT:  That is irrelevant.  I don't care about

9     what they offered in a plea.  He didn't plead, so that is

10    irrelevant to me.

11         MS. JACOB:  Your Honor, I point this out because in

12    every single prior January 6 case, this is how the government

13    has assessed this.

14         THE COURT:  So what?  That doesn't have anything to

15    do with me.  What he offered and he didn't accept it.  It is

16    irrelevant.

17         MS. JACOB:  But it is not as if they were only

18    offering the 6-level enhancement to be -- their assessment of

19    how these apply is different based on what they are telling the

20    Court.

21         THE COURT:  That is if he pled.  He didn't plead.

22         MS. JACOB:  Okay.  Maybe I can show the Court another

23    example of not a plea agreement in which the -- this was

24    separated out.  So in United States v Christopher Worrell,

25    which will be before the Court soon, probation did not apply

1    this enhancement.  And the government did note an objection to

2    that.  But the probation department did not apply it.  And I

3    think it is because it recognized it could not do so when using

4    the 2J1.2 guideline.  And then in the Daniel Scott case, Your

5    Honor, where the Court imposed a sentence of 60 months, I

6    think -- I believe this was Mr. Worrell's codefendant, the

7    government changed its tune.  And I understand that there is

8    different government counsel involved, but I think that this

9    should be uniformly applied.  And I think the majority of

10   government counsel have not advocated for the combining of

11   these two enhancements when using 2J1.2.  And if I can just

12   direct the Court --

13            THE COURT:  I don't really care what the government

14   advocated, so I don't think that matters in the least.

15            MS. JACOB:  I think then what I will say is that

16   there hasn't -- to my knowledge, there has not been a single

17   Court that has combined those two --

18            THE COURT:  Okay.

19            MS. JACOB:  -- to my knowledge.

20            THE COURT:  Okay.  And --

21            MS. JACOB:  Hopefully I am not mistaken.

22            THE COURT:  So tell me why I shouldn't be the first.

23            MS. JACOB:  So, Your Honor, I think that while I

24   understand the -- the point that the Court is making, United

25   States sentencing guidelines 3A1.2C1, application note 4, makes

1    it pretty clear that this enhancement applies in connection to

2    the aggravated assault guidelines, which are not the guidelines

3    here.  And so if we are looking for the best guidance, it is

4    the guidelines.  And they tell us it only applies in connection

5    with aggravated assault.

6              Now, I think the reason for doing that is, of course,

7    this -- I mean, it is a common sense kind of argument where if

8    the count of conviction in which you are focusing your

9    guidelines on, the highest producing guidelines, if that count

10   of conviction does not involve a -- I guess, the victim is the

11   government, essentially.  If we are using obstruction

12   guidelines, the victim is the government.  But if we are using

13   the aggravated assault guidelines, the victim is the law

14   enforcement officer.  And that is why they are separate and

15   that is why they should remain separate.

16             Here, the victim is the government for the count of

17   conviction that we were using.  And the guidelines are specific

18   in the application note 1.  They say we cannot use this

19   guideline -- this guidelines does not apply when the victim is

20   the government.  And I think that is why past courts have not

21   combined these.  And I think that is why the government has

22   recognized this in most cases.

23             And, Your Honor, I guess I will just end then.  I

24   understand the Court thinks there is a difference because one

25   is law enforcement and one is -- the 8-level enhancement is

1    just generally threatened to cause injury.  But it is the same

2    conduct.  And so just an overall fairness argument is that

3    Mr. Sturgeon shouldn't be punished twice.  I mean, we are

4    talking about 8 plus 6 levels.  That substantially increases

5    his guidelines.  From just an overall fairness, it is the same

6    conduct.  He shouldn't be doubly punished for it.  Of course,

7    the fact that it is an officer is accounted for by the Court.

8    We know that is why the case is different from some other cases

9    when an officer wasn't involved.

10            THE COURT:  Okay.

11            MS. JACOB:  So for those reasons, we would ask the

12   court not to apply the 6-level official victim enhancement.

13            And, Your Honor, I think with regards to, you know,

14   if the Court is -- is considering that enhancement, you know,

15   which we strongly don't think it applies, the Court still has

16   to kind of go to the second inquiry.  Does the official victim

17   enhancement apply?  Because did this create a substantial risk

18   of bodily injury?  And our second argument is it does not.

19   That is why we cited to the Swinton case that describes what

20   serious bodily injury is.  And that has to rise to a serious

21   level of hospitalization, long period of hospitalization, very,

22   very serious injury, not the injury that is discussed here.

23   And so for that reason as well, it doesn't apply.

24            As far as the 8-level enhancement and the 3-level

25   enhancement, all surrounding the administration of justice,

1        Your Honor.

2                THE COURT:  I couldn't hear you.

3                MS. JACOB:  I'm sorry.  Moving on to the 2J1.2B1B and

4        2J1.2B2, the 8-level enhancement and the 3-level enhancement

5        surrounding the administration of justice, we have briefed

6        that.  We have submitted support for the reasons why we think

7        those don't apply.  But I know that the Court has applied those

8        in the past, so have some other judges.  And I won't belabor

9        that point unless the Court has any questions for me.

10               THE COURT:  No.

11               MS. JACOB:  Your Honor, if the Court agrees with us

12       at least at a minimum, that the 3-level obstruction of justice

13       enhancement doesn't apply, the official victim enhancement

14       doesn't apply, then we are at a guideline range of 57 to 71

15       months, not the 135 to 168 months that has been presented here.

16               THE COURT:  Okay.

17               MS. JACOB:  That is it for the PSR objections.

18               THE COURT:  Okay.  You concur.

19               Do you want to add anything?  You still have an

20       obstruction problem because your client testified.

21               MR. ORENBERG:  Yes.  It is a separate argument for

22       obstruction of justice.  To be clear, Your Honor, we do

23       incorporate by reference the remarks and the submissions by

24       Mr. Sturgeon's counsel, as well as the submissions I made on

25       behalf of my client.  So what remains is just the obstruction

1    of justice enhancement for my client.  And the government and

2    the presentence report contend that he testified falsely at

3    trial and perhaps deleted some evidence from his cell phone

4    prior to the beginning of the investigation in this case.

5             But I would point out to this Court -- this Court,

6    you were the fact finder, you were in the position -- you were

7    in the best position to assess his credibility as a witness in

8    this case.  And Mr. Bingert came before the Court as any other

9    witness, he -- his credibility or his testimony was not

10   impeached in any manner whatsoever.  He took an oath to testify

11   truthfully and that is what he did.  He told the Court under my

12   questioning and the cross-examination of counsel over here, his

13   recollection -- his best recollections of events that occurred,

14   I guess, at that time some 28 months beforehand, which was a

15   long time ago.  It wasn't like January 6 was just a few months

16   ago, before the trial, that is.  It was events that occurred

17   over two years ago.

18            And he, obviously, had his own perspective and

19   recollections about what happened that day and that is what he

20   truthfully told this Court what happened that day.  I have

21   cited on page 7 of my memorandum, the case law, going into page

22   8, the leading case is United States versus Dunnigan, a Supreme

23   Court case at 507 US 87, 1993.  The Supreme Court has

24   recognized not every accused who testifies at trial and is

25   unconvicted will incur an enhanced sentence under 3C1.1 for

1    committing perjury.  As the Supreme Court explained, an accused

2    may give inaccurate testimony due to confusion, mistake or

3    faulty memory.  And I again would say January 6, in May of this

4    year 2023, January 6 happened over two years ago.

5            I went on to cite DC Circuit law, United States

6    versus Montague, M-O-N-T-A-G-U-E, 40 F.3d 1251, 1994, which,

7    you know, looked at Dunnigan and informed the District Court

8    here how to handle the situations such as the testimony of

9    Mr. Bingert back in May of this year.

10           He didn't have a motive or reason to testify falsely,

11   Your Honor.  He came before this Court, as I said, as any other

12   witness, took the oath and testified to the best of his

13   recollection and under I would say withering cross-examination.

14   He testified and provided the Court additional information

15   about his recollections of what occurred that day.

16           With respect to the government's assertions that an

17   obstruction of justice enhancement should be applied because of

18   the destruction of evidence that is -- I think it is a little

19   bit fuzzy.  Again, as I understand it -- and I think the Court

20   will recall, the evidence and testimony was that there may have

21   been some pictures.  He took some pictures and maybe a video

22   that afternoon of January 6.  And, you know, he didn't know

23   that an investigation had opened up against him until about 10

24   days later or so.  I don't recall.  And I think the Court will

25   agree with me and counsel will agree with me, that there is no

1    direct evidence showing when those materials were deleted from

2    his phone.  But we know they were deleted prior to the seizure

3    of his phone, which he voluntarily gave up when he

4    self-surrendered immediately following his notification that

5    the authorities were looking for him just a few weeks after

6    January 6 of 2021, which speaks volumes of my client.  He

7    wasn't running away from what had happened on January 6.  He

8    came running back towards it, to face the authorities when he

9    heard they were looking for him.  But I will make those

10   arguments later in my allocution.  So for those reasons, I

11   would say to the Court that the obstruction of justice

12   enhancement is not applicable in this case.

13            THE COURT:  Okay.  Thank you.

14            MS. KLAMANN:  Your Honor, I will be brief because the

15   basis for our guidelines calculation was set out in great

16   detail in our sentencing memo.  I will start where the defense

17   started with obstruction enhancements.

18            THE COURT:  Right.

19            MS. KLAMANN:  With respect to Mr. Sturgeon, the basis

20   for our moving for that enhancement is the fact that, yes, we

21   recovered some substantial evidence from his phone.  But it is

22   telling the evidence we did not uncover, which is the evidence

23   at the southwest stairs where he himself took action, physical

24   action against the police.

25            And we have him on video, body-worn camera,

1   specifically, holding his phone up, not for a minute, not for a
2   second, but for an extended amount of time, which supports an
3   inference that he was recording.  There are two different
4   instances, while he was at the southwest stairs where he is
5   holding his camera up.  And, again, those videos were not
6   recovered from his phone.  That is the basis for our seeking
7   the obstruction enhancement against Mr. Sturgeon.  And we
8   believe that it shows that he was acting willfully when he
9   destroyed that evidence, knowing that it was material to his
10  actions and the crimes that he committed.

11          He was fine posting videos of other people committing
12  crimes that day.  But he noticeably -- the videos where he
13  committed his most egregious crimes were absent from his phone.

14          With respect to Mr. Bingert, it is a little bit
15  different.  And I don't belabor this point, because I know Your
16  Honor was here listening to his testimony and his
17  cross-examination.  I think the key points of untruthful
18  testimony that day related to his intent and his actions with
19  respect to the bike rack and what he knew when he passed on to
20  Capitol grounds.  Those are, I think, the two buckets of
21  material information that he was dishonest about during his
22  testimony.  And those are -- those buckets go correctly to
23  elements of two of the most serious charges against him.  So we
24  believe the obstruction enhancement should apply to Mr. Bingert
25  as well.

1          I will talk just briefly about 3A1.2C1.  I think Your

2    Honor is correct, there is nothing in the law that suggests

3    that applying that along with the 1512, the 2J1 specific

4    offense characteristics would be double counting.  I also just

5    note that the government has sought that plus 6 in 1512 cases,

6    so it is not accurate to say that we have never sought the

7    application of that enhancement when we have 1512.  I can cite

8    to Your Honor a handful of cases, included cases heard by Judge

9    McFadden, Judge Walton, and I believe there was at least one

10   other judge.  We have certainly applied that in 1512 cases.

11   And so there is no legal bar to applying the plus 6 under

12   3A1.2C and the plus 8.

13          Also to the extent that the defense is arguing that

14   this is something that should only apply to an aggravated

15   assault, I will just note, this is a provision that appears in

16   chapter 3 of the guidelines.  It is not a specific offense

17   characteristic under chapter 2A2.2, which would be -- if that

18   was the Sentencing Commission's intention, they would have made

19   it a specific offense characteristic.  They did not.  They put

20   it in chapter 3, which again I think just shows that it can be

21   applicable to any offense where the facts support the

22   application there.

23          I think I will conclude there unless Your Honor has

24   specific questions about any of the other of the government's

25   positions on the guidelines.

 1          THE COURT:  It is a little problem in terms of how

 2   the government decides that you seek the extra 6.  How does the

 3   government decide that?  I mean, I understand what I -- it is

 4   in my discretion.  How does the government decide whether you

 5   seek the extra 6 points?

 6          MS. KLAMANN:  I can speak to this case in particular,

 7   Your Honor.

 8          THE COURT:  Okay.

 9          MS. KLAMANN:  That is what we are dealing with, so

10   that is all I can talk to.  We sought it in this case because

11   we believed the circumstances of the assault here that were --

12   it was a necessary step in the commission of the 1512, as well,

13   which we discussed at trial.  But the circumstances of the

14   assault here, it was a push of a bike rack and then the bike

15   rack was lifted.

16          THE COURT:  Pushing it up.

17          MS. KLAMANN:  Yeah.  The bike rack was lifted.  You

18   heard testimony from Officer D'Avignon, for example, that he

19   was physically lifted off of his feet.  And I think one of the

20   critical points is that Officer Gonzalez also testified that

21   he, in fact, suffered an injury to his shin.  The assault also

22   occurred at the top of some stairs.  So the additional

23   component here is that it created a risk for all of those

24   officers standing at the top of those stairs that they could

25   potentially fall down those stairs.  Again, this might be a

1    close call for Your Honor.  It is entirely up to you whether to

2    apply the enhancement.  But that is why we are seeking it in

3    this case.

4            THE COURT:  I think this -- I mean, Worrell sprayed

5    some bear spray at an officer.  It is different than this one.

6    And I did -- I did think about the question in Worrell, even

7    though the government didn't ask for it.  And I decided, I

8    mean, Worrell lied so I applied the other 2 points because

9    clearly he lied when he said he was spraying some woman from

10   Antifa with the bear spray and he sprayed it directly in an

11   officer's face, so I knew he was lying.  I don't want to get

12   into too many facts there.  But I did not apply the 6 points,

13   even though the government didn't ask for it.  I did think

14   about applying it.  But he was spraying the bear spray.  And

15   the video clearly showed he did the bear spray right in the

16   officer's face.  But I didn't apply it there, but it is -- this

17   is different, I agree because of the circumstances here.

18           All right.

19           MS. KLAMANN:  Thank you, Your Honor.

20           THE COURT:  The application footnote doesn't apply

21   because --

22           MS. KLAMANN:  The application footnote -- I don't

23   have it in front of me, but I am happy to pull it up.  My

24   memory is that it says where the victim of the offense is only

25   the government.  Here the victim of the offense is arguably

1    those officers at the southwest stairs.

2              THE COURT:  Right.

3              MS. KLAMANN:  So it is not just the government.  It

4    is the government, but it is also individual officers.

5              THE COURT:  Right.

6              MS. KLAMANN:  That is true for the assault and for

7    the 1512, arguably.

8              THE COURT:  Okay.

9              MS. KLAMANN:  And the previous provisions of that --

10   of that section of the guidelines I believe it is 3A1.2A and B,

11   speaks specifically of government officers.  And so I think we

12   have interpreted that application note to really be speaking to

13   the first two provisions as opposed to the third one.

14             THE COURT:  Okay.  All right.

15             Ms. Jacob, I will give you a chance if you want to

16   say something else.

17             MR. ORENBERG:  Your Honor, firstly I would just like

18   to point out that the government has not cited to a single case

19   in which the two were applied, regardless of if they advocated

20   it.  But I have it pulled up, Your Honor.  And I have the

21   provision.  And I think, for starters, the government's

22   suggestion that because it is a chapter 3 adjustment, that the

23   Sentencing Commission, you know, if they wanted to they could

24   have done otherwise.  But there are so many chapter 3

25   adjustments that direct us in the notes that it applies only in

1    this specific circumstance.

2            Now, the government says that -- they are correct

3    when it says -- I will just read the whole application note.

4    This guideline applies when the specified individuals are

5    victims of the offense.  This guideline does not apply when the

6    only victim is an organization, agency or the government.  I

7    think the important thing to focus on here is that, firstly,

8    the guideline -- the first sentence directs us, just plain and

9    simple, this guideline applies when specified individuals are

10   victims of the offense.  So the offense in which we are using

11   the guideline, 2J1.2, because it wouldn't make sense otherwise,

12   Your Honor.  Because in what world would this apply, if the

13   only -- I am just trying to think of a scenario in which this

14   would also apply when the only victim is the government,

15   because then how -- there is no serious risk of injury.  There

16   is no official victim that is a law enforcement officer.  So I

17   think that is why we should read it with the eye that they are

18   talking about the offense of the guideline produce -- the

19   highest producing guideline.

20           And I think that lastly, Your Honor, the government,

21   they can't have both.  If the highest producing guideline range

22   is the 2J1.2.  That is higher than the aggravated assault

23   guideline, even with the 6 level enhancement.  So we have that

24   here.  We are not disputing that 2J1.2 applies.  So it is

25   just -- I think that is -- it is just further support for the

 1    fact that, you know, it is an overall fairness argument, Your

 2    Honor.  And I will end on that.

 3              THE COURT:  All right.

 4              MS. KLAMANN:  Your Honor, I apologize.  May I clarify

 5    just one thing?  I just wanted to clarify for the Court, when I

 6    spoke earlier about the cases in this District where the judges

 7    have applied the plus 6, I was not meaning to represent that

 8    they applied both the plus 6 and the plus 8.  I don't know that

 9    to be the case.  But I do know that there are a couple of cases

10    where they have applied the plus 6 in a 1512 case.  So that was

11    what I was responding to.  I just want to make sure that I am

12    not misrepresenting things to the Court.

13              THE COURT:  All right.  I am going to take a short

14    recess and have a discussion.

15              (Recess taken at 4:48 p.m.)

16              THE COURT:  All right.  After looking further at the

17    issues I will -- as to the Defendant Sturgeon, I will delete

18    the 2 points for obstruction of justice.  I am not satisfied

19    despite the possibility there is an obstruction by the deletion

20    of those videos that there is sufficient evidence that it was

21    knowing and willful that I would add the obstruction to him.

22              As to Defendant Bingert, however, I am satisfied that

23    he testified falsely in some regards at trial.  And I do find

24    that his trial testimony was not credible in a number of

25    respects as I said in my oral ruling from the bench when I

1   found him guilty.  And I will allow the points to be added for

2   obstruction of justice.

3         As to the 6-point addition to both of them for --

4   that we were just discussing, I think they are appropriate

5   under the guidelines.  I think that the 6-point addition is in

6   addition for the assault on the police and it is separate from

7   the overall 8 point that was set forth in the report.  The

8   probation office had those objections and continued to construe

9   the guidelines and has considered the note to not be --

10  interpret the note in the way that the defendant does.  And the

11  Court has traditionally tried to interpret the guidelines in

12  the same way that probation does.  And I do interpret them the

13  same way that probation does here that those 6 points are in

14  addition to the 8 points when the victim of the crime is a

15  police officer who has been injured, so that the 6 point

16  addition will apply.  As to the -- so those objections will be

17  denied.

18        As to the 2 point addition for the other question

19  that was being raised about the scope of the views, I -- that

20  is also rejected.  So that is the only adjustment to the

21  guidelines I will make is deleting the obstruction counts for

22  Sturgeon.  So that would raise the total offense level to 31

23  for Sturgeon with a criminal history category of 1.

24        And I will have to ask the probation office then if

25  you will give me the new guidelines provisions for Sturgeon.

1           With a 31 total offense level and criminal history

2    category 1 for Bingert, then the guidelines provision will be

3    as set forth in the report, which for a total offense level of

4    33, criminal history category 1, would be on Count 1, 135 to

5    168 months; Count 2, 96 months; Count 3, 60 months; Count 4 to

6    6, 12 months; and Count 8 not applicable for -- that would be

7    the custody guidelines for the supervised release.  Counts 1 to

8    3, 1 to 3 years; Counts 4 to 6, 1 year; and Count 8 not

9    applicable.

10          The defendant would be ineligible for probation.  The

11   guidelines on the fine would be 35,000 to 250,000 and

12   restitution to be determined.  And special assessment of $385

13   would be required to be imposed by law.  So I have to announce

14   the guidelines that would be for Bingert.

15          And then for Sturgeon, I will have the probation

16   officer tell me what the guidelines would be with a total

17   offense level of 31 then if we delete the -- I think it had in

18   the report that -- did it have 2 or 3 for the obstruction in

19   the report?

20          MR. WILSON:  Let me grab it.

21          THE COURT:  Let me look again.  I am trying to find

22   it.  Add 2.  Okay.  So I will adjust it to 31.  So with 31, and

23   criminal history category 1, it would be what?

24          MR. WILSON:  Andre Wilson from probation, Your Honor.

25   The new guideline with 31, criminal history category of 1 would

1    be 108 to 135 months.

2              THE COURT:  108 to 135?

3              MR. WILSON:  Yes, Your Honor.

4              THE COURT:  And then Count 2 would remain 96?

5              MR. WILSON:  That is correct, Your Honor.

6              THE COURT:  Count 3, 60?

7              MR. WILSON:  That is correct, Your Honor.

8              THE COURT:  And Counts 4 to 6, 12?

9              MR. WILSON:  Correct.

10             THE COURT:  And then supervised release remain the

11   same?

12             MR. WILSON:  That is correct.

13             THE COURT:  One to 3?

14             MR. WILSON:  Yes.

15             THE COURT:  And then 4 to 6 would be 1 year?

16   Probation still ineligible.  Does the fine amount change?

17             MR. WILSON:  That is correct, Your Honor.

18             THE COURT:  The fine change or not?

19             MR. WILSON:  It does not change.

20             THE COURT:  Does not change.  So it is 35,000 to

21   250,000 still.  Okay.  And 385 for the special assessment,

22   restitution to be determined.  Am I correct there?  Okay.  So

23   those guideline determinations then -- counsel may allocute.

24   And I take it counsel have agreed that Sturgeon would go first,

25   is what you all agreed on?  Okay.  The Court will hear from

1    counsel having determined the guidelines, because that has to

2    be decided first.

3            The Court will consider the factors under 18 USC 3553

4    and any arguments for departure or variance from the guidelines

5    as well.

6            Ms. Jacob.

7            I should say the allocution by government, first.

8            MS. HOWARD:  Thank you, Your Honor.  Before I begin,

9    I did want to point out that, Captain Augustine from the

10   Metropolitan Police Department who was a witness in this case

11   is present in the courtroom today.

12           THE COURT:  Okay.

13           MS. HOWARD:  Your Honor, the government will be brief

14   in highlighting just a few of the 3553(a) factors here.  The

15   first is the nature and circumstances of the offense and the

16   offenses in this case and the need to provide just punishment

17   and respect for the law.  Your Honor is well aware of the facts

18   in this case from presiding over the trial in addition to

19   reviewing the government's sentencing memorandum, so I won't

20   belabor the facts here.  But it is important to note that --

21   that the offenses that Isaac Sturgeon committed were incredibly

22   serious and that should not be lost.

23           He participated in a massive riot in an attempt to

24   prevent the peaceful transfer of power.  He joined a violent

25   mob at the base of the inaugural stage.  He climbed through

1   scaffolding of the inaugural stage with the mob and he filmed

2   along the way.  I will point to Government Exhibit 804F.1 at

3   trial which did show him in the scaffolding seconds after

4   Captain Augustine retreated up the stairs.

5          He then joined others in a knowing and deliberate

6   assault on a line of police officers defending the Capitol.  As

7   Your Honor noted in his factual findings after the trial,

8   Sturgeon sent numerous messages in the immediate aftermath of

9   January 6 speaking of the need to start a revolution and the

10  necessity of fight and committing crimes to do so.

11         Your Honor, in mitigation of these 3553 factors of

12  the nature and circumstances of the offense and the need to

13  provide just punishment, the government notes that the assault

14  at issue in this case was indeed relatively brief in terms of

15  the amount of time.  And while Mr. Sturgeon did remain on

16  Capitol grounds and he did climb on railings or the inaugural

17  stage and he did film violence and that as Your Honor found did

18  continue to obstruct the official proceeding, Mr. Sturgeon

19  himself did not participate in additional acts of violence on

20  January 6.

21         Moving on to the history and characteristics of the

22  defendant.  Your Honor, the government at the outset does note

23  that as a part of weighing the history and characteristics of

24  Mr. Sturgeon that in his letter to the Court that was attached

25  to the sentencing submission, it does not appear that he

1    accepts responsibility for his actions or seemingly expresses

2    remorse or regret about the choices he made that day.  He

3    doesn't admit that what he did was wrong and he doesn't say

4    that he wouldn't do it again.

5            This is not a case at the wrong place, wrong time.

6    This is a case where Mr. Sturgeon made choices and he made

7    choices on January 6.  He committed several serious felonies in

8    attacking the US Capitol and trying to stop the peaceful

9    transfer of power.

10           That said, and as you have seen in Mr. Sturgeon's

11   sentencing memo, and as I am sure you will hear from defense

12   counsel and from people who are here to speak on his behalf,

13   Mr. Sturgeon does have strong family ties.  He has his own

14   family business and he does not have a criminal history.  And

15   all of those factors are worthy of Your Honor's consideration

16   in fashioning and determining a sentence.

17           Indeed, the PSR identifies his lack of criminal

18   record, his compliance while under pretrial supervision and his

19   need to provide financial assistance for his minor child as

20   possible considerations in determining whether a variance is

21   warranted and that is paragraph 162A.

22           And finally, Your Honor, the government will just

23   highlight the 3553(a) factor on the need to provide adequate

24   deterrence here.  And that is both a general deterrence and

25   specific.  Obviously, the need for general deterrence in cases

1    involving the attack on US Capitol demand deterrence and weigh

2    in favor of incarceration here.  In terms of specific

3    deterrence for Mr. Sturgeon, I note his lack of remorse or what

4    he did was wrong.  And I would also point the Court to the

5    words that Mr. Sturgeon wrote before and after the attack on

6    January 6 calling for additional violence and revolution and

7    those should weigh in favor of sentence of incarceration to

8    deter Mr. Sturgeon specifically.

9            Unless Your Honor has any questions, the government

10   will rely on the sentencing submission we submitted to the

11   Court.

12           THE COURT:  You can go ahead and talk about

13   Mr. Bingert too.

14           MS. HOWARD:  I'm sorry, yes.  Ms. Klamann will

15   address Mr. Bingert.

16           MS. KLAMANN:  Your Honor, just like with

17   Mr. Sturgeon, the government endeavored to weigh both the

18   aggravating factors and the mitigating factors with respect to

19   the each of the 3553(a) factors in this case.  And we are

20   asking Your Honor to enter a sentence at the bottom of the

21   guidelines, because we believe overall the mitigating factors

22   outweigh the aggravation here.  By far, the most aggravating

23   factor with respect to Mr. Bingert is the nature and

24   circumstances of the offense.  The actions that he took that

25   day were actions against the United States government.  And I

1   know that Your Honor knows this.  I am sure you have seen many

2   of these cases and sat through many of these sentencings.  This

3   was a very serious crime, made even more serious by the fact

4   that he actually took steps to take physical violence against

5   the police who were defending the government and the

6   congressmen and women inside that building.  So this is a very

7   serious crime.

8           There are some mitigating aspects though, even for

9   the nature and circumstances of the offense.  Ms. Howard just

10  went through some of them for Mr. Sturgeon and they also apply

11  for Mr. Bingert.  He did not bring with him a deadly or

12  dangerous weapon.  His assault on the police while serious and

13  significant was relatively short in duration.  And there was no

14  other violence that he committed against the police that day.

15  So those are all mitigating factors that we believe support a

16  sentence at the bottom of the guidelines range.

17          With respect to his history and characteristics, we

18  talked about this a little bit in our sentencing memoranda, but

19  he has no criminal history.  I think that is significant.  And

20  we do not mean to suggest that somehow that is aggravating, it

21  is not.  But we did want to just point out to the Court that a

22  lack of criminal history, stable upbringing, stable employment,

23  can sometimes be a double edged sword.  Because it is clear

24  with that kind of background that this crime was not a crime

25  committed because of poverty or neglect or need.  Mr. Bingert,

1    just like Mr. Sturgeon, made a decision to undertake his

2    actions on the day before January 5th to travel to Washington,

3    DC and for several hours on January 6 while he was on US

4    Capitol grounds.

5            But we believe ultimately his lack of criminal

6    history is mitigating.  And his stable background and familial

7    support is also mitigating.  Ms. Howard already covered general

8    and specific deterrence.  I know again that Your Honor knows

9    the importance of general deterrence in these cases, to send a

10   message to ensure that attacks on our government like this do

11   not occur in our future.  We discuss specific deterrence in our

12   memo as well.  And the same factors that I have already talked

13   about with respect to Mr. Bingert's history and characteristics

14   also indicate he is likely at a low risk of recidivism given

15   his lack of criminal history here.  So those are all of the

16   reasons why we have asked Your Honor to enter a sentence at the

17   low end of the guidelines.

18           THE COURT:  All right.

19           MS. KLAMANN:  Thank you.

20           THE COURT:  Ms. Jacob.

21           MS. JACOB:  Your Honor, it is very scary to be

22   standing here when the government is requesting a sentence of

23   more than a decade for Mr. Sturgeon, for a man who has not been

24   in trouble not once in his life.  The government's

25   recommendation, while we agree that this is a serious case, we

1   agree the charges are serious, nobody is disputing that.  But

2   even still, the government's recommendation, it borderlines

3   cruel and unusual, in my opinion, Your Honor.  It is

4   unprecedented.  It is disproportionate and seeks -- does not

5   fully -- I understand the government is making an attempt to

6   highlight some of the mitigating factors.  I think that the

7   weight they have given those mitigating factors is not nearly

8   enough when they are making their recommendation.

9         And if the Court remembers, you know, I was just here

10  before the Court for the sentencing of Eric Watson.  And the

11  Court gave him 135 months, the same sentence that they are

12  asking for.  And that was a brutal kidnapping and a double

13  carjacking with an individual who had a long criminal history.

14  So I just think that the recommendation when considering the

15  types of defendants that sentences like that are imposed, I

16  think that their recommendation is just far off.

17        Your Honor, and it may be that, Your Honor -- I am

18  not sure.  I don't want to speculate, but it may be that the

19  government is proposing 11 years, hoping that the Court maybe

20  will split the difference.  You know, sometimes that happens.

21  Sometimes in sentencing practice that happens.  But I don't

22  even think the difference is appropriate.  I mean, I think the

23  Court should be starting from a place of what is appropriate

24  based on the conduct and based on past similar cases to not

25  create unwarranted sentencing disparities.  So I am asking the

1    Court not to consider that as a starting point, not to consider

2    their recommendation as a starting point.

3              THE COURT:  Well, I do start with the guidelines.

4    You know, I am a guidelines guy, you know that.

5              MS. JACOB:  I do know that, Your Honor.  But I do

6    think -- and I will get to this soon.  I do think that a

7    substantial departure is warranted because of aberrant

8    behavior.  And I know that Mr. Orenberg also emphasized this in

9    his papers.  So if the Court is a guidelines guy that it -- the

10   Court will recognize that --

11             THE COURT:  I do recognize there are times when I

12   depart.

13             MS. JACOB:  Absolutely.  No.  And I am hoping the

14   Court will do so here.  And I do know that is the starting

15   point for the Court.  But the -- you know, the case law and

16   progeny of Booker has made it very clear that is just one

17   factor in the analysis.

18             Your Honor, the starting out with the personal

19   history and characteristics of Mr. Sturgeon, I think it would

20   be best to start with, you know -- we prepared a video that we

21   hoped would help the Court understand Mr. Sturgeon and his

22   history and characteristics.  We submitted it to the Court

23   along with several other things.  But I would like to play it

24   for the Court with the Court's permission.

25             THE COURT:  Okay.

1          (Video played.)

2          MS. JACOB:  Can the Court hear that?  I know it is

3    faint.  I had to bring an external speaker because my speaker

4    had issues.

5          THE COURT:  Maybe you can hold it up to the mic.

6          MS. JACOB:  I will start it over.

7          (Video played.)

8          MS. JACOB:  Your Honor, the -- his family, obviously,

9    continues to provide him support.  They have been since the

10   very start of this case and they will do so regardless of what

11   happens.  Your Honor, one mistake should never define an

12   individual.  One mistake does not erase all of the wonderful

13   things that a person has done, their contributions to the

14   community.  And these thing should not count for nothing.  You

15   know, the government -- you know, they mentioned -- they took a

16   look at the letter from Mr. Sturgeon.  They tried to point out

17   something negative about it.  But what I will say is

18   Mr. Sturgeon is a solemn guy.  He is reserved.  And it was

19   really hard for him to formulate what -- he is not a lawyer.

20   He didn't have our assistance.  We didn't coach him.  He was

21   telling the Court that he regretted his actions in his own way.

22   So I think it is not fair for the government to suggest that he

23   wasn't expressing remorse.

24          And I think the letters that were provided to the

25   Court also say the same thing.  There were several individuals

1    who said they had personally spoken with Mr. Sturgeon and that

2    they are sure that he is remorseful.  I think remorse can be

3    expressed in a lot of different ways, Your Honor.  For someone

4    like Mr. Sturgeon, the fact that he completely separated

5    himself from social media after his arrest is one of them.  The

6    fact that he has been completely courteous and calm and

7    gracious throughout all of the proceedings that we have had

8    before this Court is another way.

9              And, Your Honor, I -- you know, the government

10   focuses on the very post January 6 statements that were very

11   short lived.  What I will say is the Court knows that

12   Mr. Sturgeon was not going to take place in a revolution

13   following January 6.  I mean, that is just not what he did.  He

14   went back to work.  He wasn't even going to -- he had no prior

15   planning to even go to the Capitol.  It was done on a whim.

16             THE COURT:  He is like a lot of these defendants, who

17   are in the wrong place at the wrong time and got caught up, I

18   understand that.  That is what makes these cases so sad.

19             MS. JACOB:  I understand, Your Honor.  And I think

20   the Court probably already knows how I feel about the former

21   president and how that played a role in ordinary Americans

22   around the country being pulled into this.  And I also think it

23   is very sad.  And I just would hate for Mr. Sturgeon's life to

24   be derailed in such a way.  He knows he is going to be

25   punished.  He knows this.  And his whole process has been

1    punishment, trust me.  He can't have a gun.  That is a huge

2    punishment.

3                    THE COURT:  In Montana, that is.

4                    MS. JACOB:  It is devastating to him and his family.

5                    THE COURT:  Even in Texas, that would be.

6                    MS. JACOB:  Is that right?  I have never been to

7    Texas before, but I would imagine that would be the case.

8                    But I have been to Montana and I know how important

9    hunting there is.  I know it is a way of life.  And I know that

10   Mr. Sturgeon will never be able to take part in that again, not

11   with his parents, not with his children, not with his

12   grandchildren.

13                   And so, you know, I also think that the whole remorse

14   thing, I just want to put into context for the Court that

15   Mr. Sturgeon wouldn't be here today, if, you know, after a

16   trial if -- he did want to accept responsibility with the civil

17   disorder plea.  And I know that is not -- the Court doesn't

18   like to get involved in that kind of thing.  But the civil

19   disorder, it was shut down.  But I know the Court knows from

20   lots of civil disorder cases it has had, that his conduct is

21   not that dissimilar to those cases.  So I don't think it is

22   fair to say that Mr. Sturgeon is not overall remorseful for

23   being at the Capitol building, for doing the things he did and

24   for just what it has brought to his family, the embarrassment.

25   You know, he has lost half of his business -- after January 6,

1   he lost half of his business.  He had to rebuild that.  And

2   thankfully he has.  And he is -- he has gained the respect of

3   many people in the community as the Court has seen from the

4   letters, despite all of these allegations and despite the media

5   going after him.  You know, the local Montana papers if the

6   Court can imagine, Mr. Sturgeon was the focus.  You know,

7   anything that happened with this case, it was reported.  You

8   know, and it is just so -- that kind of embarrassment in such a

9   small town where everybody knows everybody is quite the

10  punishment, Your Honor.

11          Of course, he feels extremely terrible about his

12  conduct and about the fact that his family had to go through

13  that too along with him.

14          Your Honor, I just want to touch on the facts of the

15  case.  I know the Court is well aware, but I think it is

16  important to emphasize that he did not go there with a prior

17  intent.  The Court has seen a lot of cases where the past, you

18  know -- the past messages of individuals such as the Proud Boys

19  and the Oath Keepers, it really indicated they were prepared

20  for violence.  They wanted it.  This was not Mr. Sturgeon.  He

21  was -- it was a spur-of-the-moment decision.  He had made plans

22  to travel to Africa.  And he heard about the rally.  He said

23  you know, I need to see about my visa.  So I will stop there,

24  see the rally and then I will be on my way.  That was his

25  intent.

1          When he went to the rally and the former president
2    instructed everybody to go to the Capitol building, he did so.
3    And he did so along with thousands of other people.  He wasn't
4    alone.  He didn't lead the -- he didn't lead everybody to do
5    that.  He was in the mix.  And so if it wasn't for that, Your
6    Honor, if it wasn't for that moment at the rally when former
7    President Trump instructed them to go, I think it is clear,
8    Mr. Sturgeon would have had no part in anything.  He would have
9    been a tourist in DC, just like the pictures that the Court saw
10   at trial afterwards.  And he would have been an ordinary
11   tourist and he would have went to Africa with no incident.

12          Most of the time he was there -- he recognizes this.
13   He should not have remained on the grounds.  But his demeanor
14   was really notable in comparison to a lot of other January 6
15   defendants that were heckling at police, yelling at police,
16   really causing a ruckus.  That wasn't Mr. Sturgeon.  His hands
17   were in his pockets most of the time.  He didn't -- he didn't
18   yell.  He didn't call police officers names.  And I do think
19   that distinguishes him.  Also notable, Your Honor, he didn't go
20   into the building.

21          And that is not because he couldn't.  There were many
22   entrances at that point that had already been breached.  He
23   didn't want to.  That wasn't why -- he knew that -- he did not
24   want to cross that line.  There is a lot of other defendants
25   that maybe didn't have the opportunity, because they were

1    arrested on the spot.  And they were originally planning on

2    going in, but he stayed after the barricade incident for a

3    while.  And he had ample opportunity to go in, if he wanted to

4    and he didn't.

5           And then after that, Your Honor, he stayed in DC for

6    a couple of days, got his visa approved and traveled to a few

7    different countries including Kenya.  He voluntarily came back.

8    He complied with the deportation process.  It wasn't until he

9    was there that he learned he was under investigation.  And they

10   returned him not in custody.  He returned on a plane that he

11   was instructed to go to.  He knew he would be arrested at the

12   JFK airport.  And he was.  And he turned over his phone.

13          Ever since then, Your Honor, there has been no social

14   media, no claiming that January 6 was a hoax.  No claiming that

15   it was all Antifa's fault.  He has owned up to his own

16   responsibilities.

17          He has been in perfect compliance with pretrial

18   supervision.  He has been focused on his work.  Your Honor, he

19   has been building his home that Your Honor saw in the video.

20   He has a young daughter now that he has been supporting and who

21   he really wants to see.  He hasn't seen her yet because of this

22   case.  And I think that they -- at this point in time, you

23   know, they do have -- hopefully -- they do have plans for him

24   to sponsor them to come to the United States at some point so

25   that they can have a meaningful relationship.

1           Your Honor, I listed a lot of comparator cases in my

2   sentencing memorandum.  But with the Court's indulgence, I'd

3   like to focus on just a couple today that I really think

4   illustrate how disparate the government's sentencing

5   recommendation would be in this case.  The Court's indulgence.

6           Mr. Smock is more technologically advanced than me.

7           Okay.  All right.  Your Honor, I first want to go

8   over a case that is indisputable.  It was more violent, more

9   serious than Mr. Sturgeon's.  It is the case of Kevin Creek

10  where he got -- where a sentence of 24 months was imposed.

11  And, let's see.  So on January 6, Mr. Creek, he packed a

12  backpack with supplies, including a first aid kit, mace, a boot

13  knife and binoculars.  Mr. Creek -- and he had three people

14  with him, I think.  They all had radios in case the phones went

15  down.  He got to the west front of the Capitol and joined the

16  mob pushing up against the bike rack barrier and officers

17  behind it.  And he helped the mob to push through that barrier

18  breaking the line of officers.

19          Then Mr. Creek ran through the front of the crowd and

20  he grabbed an MPD officer and drove him backwards.  And then

21  after letting go of that officer, Mr. Creek hit him in the face

22  shield of his helmet essentially.  Mr. Creek then made a bee

23  line.  He made it past them for a US Capitol Police officer who

24  was attempting to protect himself behind a bike rack.  And then

25  Mr. Creek went around the bike rack barrier and gave a hard

1    shove in the shoulders and then kicked that officer and it

2    caused him to fall back.  After backing away from the officer,

3    Mr. Creek picked up a fixed strap with heavy metal buckles from

4    the ground and threw it at the direction of officers.

5              So the plea -- the plea in this case was the same

6    charges as Mr. Sturgeon.  And the government in that case

7    recommended 27 months and the Court ended up imposing 24 months

8    followed by 12 months supervised release.

9              THE COURT:  That is based on the plea.

10             MS. JACOB:  It was based on a plea, yes.  And, Your

11   Honor, I understand that the Court makes -- truly makes a

12   difference between the two.  But our suggestion is that it

13   shouldn't be years above what is given in a plea and because

14   somebody chooses to exercise their right to go to trial,

15   especially when looking at the actual conduct.

16             THE COURT:  Well, I can tell you now I wouldn't have

17   given him that, but --

18             MS. JACOB:  And, Your Honor, I understand.

19             THE COURT:  You can bet your bottom dollar.

20             MS. JACOB:  But, Your Honor, there are specific

21   circumstances in every case.  And so I am pointing out what I

22   can.

23             THE COURT:  Just looking at these pictures.

24             MS. JACOB:  I understand, Your Honor.  I understand.

25   But I think that Mr. Sturgeon should be sentenced in a way that

1    has been uniform with the rest of January 6 defendants.  I

2    think that is a big factor under the 3553(a) factors.  And that

3    is why we point it out when we are looking at specific conduct.

4    But, of course, there are so many other mitigating factors in

5    this case that also support our request a variance.

6              THE COURT:  He must have a great record.

7              MS. JACOB:  Your Honor, I --

8              THE COURT:  I am just teasing.

9              MS. JACOB:  The second case I would like to focus on

10   is the case of Phillip Young.  And this is actually the most on

11   point case I can think of, Your Honor.

12             THE COURT:  Same judge.

13             MS. JACOB:  But this is the most on point case I can

14   think of, Your Honor.  Because this is in the same area --

15             THE COURT:  Naturally the same judge.

16             MS. JACOB:  The same judge as the Creek case.

17             I understand, Your Honor.  But I provided many

18   different judges, Your Honor.  I have not just, you know, I --

19   there has -- and there are sentences from this Court as well

20   that the Court is very well aware of, obviously, that are much

21   lower than what the government is recommending.

22             But I think this is an important case to point,

23   because this man was in the exact same place as Mr. Sturgeon.

24   And he was one of the ones that, unlike Mr. Sturgeon, was just

25   constantly yelling at officers.  And I think the Court may

1   remember him from the trial videos.  He then took part in that

2   same incident.  And he also lifted the metal rack.

3          THE COURT:  He is pushing, yeah.

4          MS. JACOB:  And these -- you know, these photos are

5   indistinguishable from the ones that government has showed.

6   And he received a sentence of 8 months, Your Honor, 8 months of

7   incarceration.  The -- but if the Court is thinking, okay, it

8   is just because of the plea, there is more.  He did it a second

9   time, Your Honor.  Mr. Sturgeon left the area -- left that area

10  with no incident after the first time.  But Mr. Young did not.

11  He -- this -- Your Honor, this is just when the officers are

12  reacting by using pepper spray.  And he -- this man, instead of

13  recognizing that this was a problem like Mr. Sturgeon, put his

14  hand up in the air.  And he, you know, he submitted.  This man

15  continued to yell saying, really, really, what is the problem?

16  And used a couple expletives.

17          And this man stayed 30 more minutes in the exact same

18  location.  And did -- and did the same thing.

19          I'm sorry.  He attacked another line of officers in

20  the same location.  But then he also did something that, of

21  course, completely separates him from Mr. Sturgeon in that

22  later on, he let out the tires of a government vehicle.  So,

23  Your Honor, to the extent that -- I'm sorry, Your Honor, this

24  is the second incident.

25          So to the extent that the Court is thinking, you

1    know, well, he pled guilty and, you know, that is that, eight

2    months versus 11 years is a substantial thing.  And Mr. Young's

3    conduct, I would argue is worse.  He was heckling police.  He

4    was yelling at them.  And he did it twice, not just once.

5              THE COURT:  What was the offer he turned down here?

6              MS. JACOB:  It was a plea to the two most serious

7    charges in the indictment, the assault and the obstruction.

8              THE COURT:  What was the offer, about what the

9    guidelines --

10             MS. JACOB:  Forty-one to 51 months.

11             THE COURT:  All right.

12             MS. JACOB:  Your Honor, I think that, you know, the

13   difference shouldn't be so much with somebody pleading guilty

14   versus going to trial.  Mr. Sturgeon notably elected a bench

15   trial in this case.

16             THE COURT:  I understand.

17             MS. JACOB:  He saved a lot of resources by doing

18   that, so that was intentional.  Civil disorder cases, Your

19   Honor, also show some of the disparities here.  We have Aaron

20   Mostofsky who also pushed up against a barrier, stole a bullet

21   proof vest from an officer, which he wore inside the Capitol

22   building.  And he also received 8 months.  David Blair used a

23   stick to push against an officer's chest.  He received 5

24   months.  And this Court gave Nolan Cooke 12 months and a day

25   for pushing against a bicycle rack manned by police and also

 1   used a stick to hit a window of the Capitol building.  But the

 2   guidelines are just lower in those cases.  And that is the

 3   starting point for the courts were the civil disorder

 4   guidelines.  But when you look and compare the conduct, Your

 5   Honor, it is really not that dissimilar.

 6          Your Honor, the downward departure that I mentioned,

 7   I think is extremely applicable here.  It is 5K2.20.  And these

 8   charges are entirely inconsistent with Mr. Sturgeon's otherwise

 9   law abiding life, that he is eligible for this departure.  It

10   recognizes that there should be a difference in punishment in

11   these scenarios where the conduct presents a marked deviation

12   from an otherwise law abiding life.  His community has nothing

13   but good things to say about him.  He has gone on mission

14   trips.  He served the community with his work.  He has -- you

15   know, he has even -- the letters explain that the elderly

16   population in the community, they rely on him for landscaping

17   work.  They can't do it themselves, so they have come to rely

18   on Mr. Sturgeon for that.

19          Dr. Hunt at trial, he testified that he has always

20   been a peaceful person, even trying to defuse tense situations

21   for others.  And I provided a couple of examples in the

22   sentencing papers of courts granting extensive departures.  One

23   court even granted a 9 level departure because it found there

24   was a lack of planning and the person led an otherwise law

25   abiding life.

1    You know, Your Honor, in closing, an 11-year

2    sentence, I think that is imposed when the Court is truly

3    afraid that letting somebody remain in the community will not

4    protect the community and that person has to be removed in

5    order to protect it.  And that is just not the case we have

6    here.  This kind of sentence will not only effect Mr. Sturgeon

7    and his ability to have a family.  You know, we are talking

8    about a 34-year-old man who is just starting a family and who

9    wants to have more of a family.  He won't -- Your Honor, he

10   won't be able to do that after a decade or so.  It will just

11   completely derail him in the prime of his years.  And for what?

12   The community will be negatively effected by this too, a

13   community that relies on him, a family that relies on him.  So

14   there is no identifiable goal to incarcerating him for a long

15   time.

16        If the Court gives Mr. Sturgeon a chance, he will

17   continue to work, continue to support his family and continue

18   to be a positive member of society.  Like I said before, Your

19   Honor, he is a felon.  He can never go hunting again.  I mean,

20   he is -- specific deterrence.  I disagree with the government,

21   it has been met.

22        This -- his family is here, Your Honor.  And his

23   mother and father do wish to address the court.  And, you know,

24   Mr. Sturgeon, you know, I have talked to him about addressing

25   the Court.  He is very nervous.  He would like the Court to

1    accept his sincere apologies in the letter.

2            THE COURT:  Okay.

3            MS. JACOB:  But if the Court -- if I can first

4    present Mary Sturgeon, she would like to make a statement.

5            THE COURT:  All right.

6            Good afternoon.

7            MS. STURGEON:  Good afternoon, Your Honor.  And

8    remind me to speak up.  I have a soft voice, so if you can't

9    hear me, just interrupt me, please.

10           THE COURT:  Okay.

11           MS. STURGEON:  I don't even know where to begin.  Our

12   son means the world to us.  We have two daughters and they are

13   married.  And our son and those three -- our three children

14   have always been very tight, very close.  And their husbands

15   love Isaac.  One of their husbands has no brothers.  And he is

16   so excited to finally have a brother, and a brother that he

17   admires and loves.

18           As you have heard said before, Isaac is -- he is very

19   laid back.  He is a calm person.  I remember many years ago, he

20   was an older teenager.  And there was a situation where we were

21   all inside of a building.  And I was asked to find something

22   real quickly.  And I remember walking away with my shoulders up

23   in a hurry.  And he said -- he saw me, discreetly he came

24   around and he said, mom, you can slow down.  You can put your

25   shoulders down.  It will be okay.  You can take your time.  And

1  I learned -- he doesn't even realize it, but I learned better

2  how to be calm and realize -- you would think I would know.  I

3  am his mom, but, you know, I -- I just realized that things

4  will happen at the right time.  And if I rush too much, you

5  know, I will make mistakes.  But it was just a very -- it was

6  just a blessing.

7          Anytime -- I loved to -- if we have traveled with

8  him, I enjoyed traveling with him.  If we miss -- say if you

9  miss a flight or a ride, he said, don't worry about it, we'll

10 just -- we'll adjust and we'll catch the next one.  Even at a

11 crucial time in my husband and my marriage, several years ago,

12 he stepped up to the plate and he helped us to get through it.

13 And he had a major impact to help us.  When he was young, we --

14 you saw the property that he bought from us.  And there is an

15 irrigation canal there.  And the three kids would -- when they

16 were little, they had permission.  And they would -- at certain

17 times of the summer, I would take them up to the canal and they

18 would get to jump off the bridge.  And then we had these huge

19 inner tubes from like a tractor tire.  And we tied that with a

20 rope to the bridge.  And they would all get in that.  They pull

21 the rope up close to the bridge and then let it drift back

22 down.

23          There were leeches in that canal.  That was not very

24 nice.  But I just remember some of the great memories at that

25 place.

1          Somehow or another, I don't know if my husband told

2   him or suggested it, but he decided -- Isaac decided he was

3   going to dig this big hole.  That was his project all summer

4   long.  He was a little fellow.  And he just kept digging and

5   digging.  It was a great way to keep him busy.  And then later

6   on, he filled it up again.  He loved to be busy.  He loved to

7   work hard.  And that is still how he is.  He is -- he is a hard

8   working fellow.  I hear people talk about that all of the time

9   in our little town.  I enjoy every season when it is the busy

10  season for him.  Sometimes I will see his pickup truck with

11  his -- his equipment that he is hauling.  And I will pass him

12  in town.  And usually he will have just the slight wave.  And

13  he will flash his lights at me, because I am mom.  And I enjoy

14  seeing him around town.

15          For many years I have been the volunteer coordinator

16  at our hospital.  And I remember when I first was chosen to be

17  the coordinator, there were a lot of elderly ladies there.  And

18  they -- multiple ladies said, are you Isaac's mother?  He takes

19  care of my lawn.  They -- it was a good testament to me to see

20  how my son treats people when he is away from me.  And he does

21  treat them with respect and kindness.

22          When he was a little boy also, one time we were going

23  to go to the ranch of one of our friends to ride horses.  And

24  my friend Sue Marxer was bringing the horse out, put the bridle

25  on.  And I looked over and Isaac was -- I don't know how old,

1    he was maybe 4.  And he was taking his shirt off.  I said, what

2    are you doing?  He said, well, mommy, you said we were going to

3    ride bareback.  My friend said I should put that in "The

4    Reader's Digest."  And I never did, but I thought that was

5    great.

6            Something else -- I am not a good chess player.  But

7    he has taught me to play chess, but I always forget how.  So

8    whenever we play it again, periodically, he has great patience.

9    He helps teach me how that maybe I can beat him.  I think maybe

10   he lets me beat him once in a while.

11           I seek his advice also.  I have done that over the

12   years.  And he thinks differently than I do and I appreciate

13   that.  He cares for my husband and my property.  He is

14   available when we need him.  He has brought -- he still brings

15   friends to our house.  He has fixed meals for us.  He is a

16   blessing.  He cleans up after himself, which I admire.  He has

17   a lot of military friends.  And I -- there was some military

18   gentleman -- he loves to quote quotes from things he reads from

19   various people.  And there was one military man who I believe

20   he said, one of the most important things in the morning is to

21   make your bed.  It sets you for the day.  And it is a simple

22   thing to do.  It shows some discipline.

23           I am approached by people pretty much daily, people

24   of all ages in town, especially this past summer, by people who

25   are very concerned about his situation and this whole thing:

1      Marge Jappe, Pete and Laura Wakeman.  They love him.  They are

2      younger.  Marge is older.  Sam Guttman.  I got Isaac's

3      permission to ask a few of his clients about character

4      reference letters.  So Mr. Guttman and I met in town.  And he

5      lives far out in the country.  So we met in town and I remember

6      him saying, you know, we don't have the same possibly political

7      outlook, you know, we don't agree on everything.  But we

8      don't -- he said, Isaac has never tried to talk me into

9      anything.  He said, we don't really talk politics.  But, of

10     course, with this situation, it has come up.  And he said Isaac

11     is very respectful.  He is not concerned about my beliefs and

12     all of that.  And he said, I don't know -- I don't know what I

13     am going to do without him.  He lives, like I said, far out.

14     And he has quite a bit of property.

15             Many friends of ours who have known our son for

16     years, Eric and Starr vanDalen, Joe and Linda Nottingham.

17     Elsie Lawlor, she was one of my volunteers at the hospital.

18     And we spoke on the phone recently.  And she was just -- she

19     was crying, because she said I don't know -- what am I going to

20     do without him?  He always takes extra care.  He will do other

21     things around, you know -- there is various clients that have

22     said that.  He will -- he will sit down, have a glass of

23     lemonade, if they just need somebody to visit with.

24             There is a handicapped man that he told me about that

25     he was taking care of that property a -- some time back.  And

1    he spent time with him, you know, and listened to the fellow --

2    visits with him.

3           My boss, the district superintendent of schools,

4    Randy Shipman, he loves Isaac.  He checks on me.  He said,

5    Isaac is a good man.  He still is, through all of this, he is a

6    good man.  I -- the list goes on and on.  There is people of

7    all walks of life, the foundation director at the hospital,

8    Brooke Erb, she checks on him, my coworkers, my brothers,

9    doctors, other people, construction workers.  People are

10   constantly asking me or texting me or talking to me about him.

11   And I just -- I just beg for your mercy.  He is a good man.  He

12   is a profoundly good man.  I would ask that you would not let

13   just a single event in his life take him away from us, please.

14          THE COURT:  Okay.  Thank you.

15          MS. JACOB:  Mr. Sturgeon's father, Steve Sturgeon

16   would also like to address the court.

17          MR. STEVE STURGEON:  Thank you, Your Honor, for being

18   willing to listen to a dad.  He is my only begotten son.  And

19   he goes -- he likes dancing and goes down to the bars and -- to

20   dance.  And he is a good dancer.  And the police go in -- you

21   know, there is policemen that are keeping order and things.

22   And they ask the bartenders, all of the time, they go, does

23   Isaac Sturgeon drink?  They go, no, no, he never drinks.  All

24   the police, the chief of police, the city police, the deputy

25   sheriff, it is kind of a known thing, they want to find him

1    drinking one time, just to say he did it.  And a 34-year-old

2    not drinking, that is just unheard of in Montana, doesn't

3    drink, doesn't smoke.  But the thing is, there is nowhere to

4    visit and meet people in Montana, so he'd go down just

5    socially, talking and laughing and having a good time.  And he

6    doesn't start fights.  He has stopped many.  He has stopped

7    many a fight.  I believe just personally, that if he is

8    incarcerated, he will not be a better person when he gets out.

9    I think the influence and the bad manners he might learn would

10   actually be a detriment to society.  And in Montana society, in

11   Beaverhead county where we live, society will be worse without

12   him.

13           And I am just saying that the community loves him and

14   needs him.  My wife and I love him and need him.  He helps me

15   put chains on in the winter to get around to driving truck.  He

16   helps me load the game and hang it up.  And he does -- he

17   does our lawn for us.  I had back surgery, so he helps us

18   tremendously.  He lost over half of his business and tens of

19   thousands of dollars.  I believe he has learned -- I know that

20   he has learned lessons.  We have talked.  I have learned

21   lessons from this.  I don't believe you will ever see something

22   like this again.

23           And he has been shamed and shunned by the newspapers.

24   And so he has received quite a bit of -- you can call it

25   punishment for being, like you said, in the wrong place, wrong

1    time and caught up in it.  For the future of his -- our

2    grandchildren, I just plead for you to consider this as an

3    unusual case.  And we implore the Court to be merciful, please.

4    Thank you, Your Honor.  Thank you.

5              THE COURT:  Thank you.

6              All right.  Mr. Orenberg.

7              MR. ORENBERG:  Thank you, Your Honor.  Once again I

8    am in an enviable position.

9              THE COURT:  Hard act to follow.

10             MR. ORENBERG:  Not only a hard act to follow, but

11   again I am saying much of what Ms. Jacob said on behalf of

12   Mr. Sturgeon with respect to weaving the legal arguments or the

13   guideline arguments into the allocution apply to Mr. Bingert

14   and I think the Court recognizes that.  So I am not going to go

15   over a lot of the things that she already touched upon.  But

16   before we get started, I would like to take care of a couple of

17   housekeeping matters.  I have a late character support letter.

18   I have already given government counsel a copy.

19             THE COURT:  Okay.  Okay.  Good.

20             MR. ORENBERG:  For the record, this letter is from --

21   and I would ask that it be made part of the record.

22             THE COURT:  Yes.

23             MR. ORENBERG:  From Dan and Laurie Wuchter,

24   W-U-C-H-T-E-R.  Although they are somewhat new to Mr. Bingert's

25   life, they provide an insight into their thoughts about

1    Mr. Bingert about what they can do to Mr. Bingert when he

2    returns to the community.  Also, Your Honor -- and I apologize.

3    I failed to notice this until a few minutes ago.  Paragraph

4    164A of the presentence report, if the Court has a copy or if

5    Mr. Wilson has a copy, it indicates that my client has a minor

6    child.  He does not have a minor child.  I think that was

7    perhaps an oversight on probation's part when preparing these

8    two presentence reports together.  So I would ask that be taken

9    out.

10         Your Honor, as I pointed out before, his parents

11   are --

12         THE COURT:  I thought that was strange, because it

13   didn't have anything about it in there.

14         MR. ORENBERG:  Right.  It is just an inadvertent

15   oversight.  I am pretty sure it is an inadvertent oversight on

16   behalf of the probation office.  As I pointed out, his parents

17   are here.  They have submitted letters.  I don't think they

18   want to address the Court.

19         His mother does want to address the Court now at the

20   appropriate time.

21         THE COURT:  Okay.

22         MR. ORENBERG:  Your Honor, Mr. Bingert, much like

23   Mr. Sturgeon, did not do any preplanning, did not come with a

24   group of other people.  Did not --

25         THE COURT:  And I take it they didn't know

 1    Johnatakis; right?  The three of them were just there together?

 2            MR. ORENBERG:  They were just there together.  They

 3    didn't know each other.  I think the Court saw for the first

 4    time today, I think it is Mr. Creek, the other case that

 5    Ms. Jacob presented.  If you saw that second-to-last picture,

 6    before the picture of him puncturing the tire of the car, there

 7    was a picture of Mr. Creek holding the fence line.  And my

 8    client was next to him.  I think the Court is shaking its head

 9    in the affirmative, so the Court did recognize that.

10            THE COURT:  Right.

11            MR. ORENBERG:  I point that out -- I guess I am

12    jumping ahead, because much of my argument or what I want to

13    reinforce to the Court goes to analyzing and analogizing

14    similar, conduct similar cases.  But in that case of Mr. Creek,

15    as Ms. Jacob aptly pointed out --

16            THE COURT:  Because, you know, I wouldn't have given

17    him the sentence he ended up with.

18            MR. ORENBERG:  I know that, Your Honor.  That is

19    Judge Friedrich.  And I have had January 6 cases with Judge

20    Friedrich.  And she has handed out significant sentences in the

21    appropriate time.  But she saw fit, based on that conduct --

22    and his conduct as Ms. Jacob presented to the Court is much

23    more egregious than the conduct that my client did that

24    afternoon.  She meted out --

25            THE COURT:  That is right there with Johnatakis too.

1          MR. ORENBERG:  I'm sorry?

2          THE COURT:  He is right there with Johnatakis too.  I

3    can't get that one to trial yet.

4          MR. ORENBERG:  I know.  I know.  Time will tell on

5    that.  I am somewhat jumping ahead.  But as long as we are

6    talking about similar cases, which -- and I pointed out -- I

7    also pointed out in my papers the Philip Young case -- excuse

8    me while I get to it -- which Ms. Jacob already talked about.

9    I talked about the case of Troy Sargent on page 19 of my

10   sentencing memo.  That is a Judge Hogan case.  In that case,

11   Mr. Sargent pled guilty to essentially the same crimes that

12   Mr. Bingert was found guilty of.  And Mr. Sargent, like

13   Mr. Bingert, stood in a line and pressed into the police line.

14   And Judge Hogan imposed a sentence of 14 months.

15          And then the case of Matthew Council, that is a Judge

16   McFadden case, 21-207.  Again, it was a plea.  Mr. Council pled

17   guilty to essentially the same crimes as Mr. Bingert.  And

18   Judge McFadden sentenced Mr. Council to 5 years -- I'm sorry --

19   60 months -- 60 months probation, 180 days of home

20   incarceration and lengthy community service.  And Mr. Council,

21   unlike Mr. Bingert, actually went into the building -- went

22   into the US Capitol building that afternoon.

23          I highlighted these three cases because I thought

24   they would provide this Court some guidance on where to peg

25   Mr. Bingert in comparison to other January 6 defendants.  And I

1    think what Ms. Jacob has done is pointed out the case of

2    Mr. Creek.  And I know this Court is aware of other cases where

3    similar conduct has occurred, whether or not it was a plea or a

4    trial or bench trial that we had here.  But the Court, I think,

5    has an obligation, as the other judges of his Court have done,

6    to take care when they analyze and make sure that the sentence

7    they impose is similar to other January 6 defendants who

8    committed similar conduct on that day.

9              And I would say, as Ms. Jacob has said, an 11-year

10   sentence or a 135-month sentence is way too much in this case.

11   And now we get to reasons why.  Okay.  As I have laid out in my

12   papers and as the government laid out to some extent some

13   mitigating factors about his law abiding life and the fact he

14   was involved for a short duration, those were their words, that

15   he did not bring any weapons.  He did not pick up anything and

16   use it as a weapon, he didn't spray any irritants, nothing like

17   that.  But for a brief few moments in time, that is what we are

18   here about, what happened on that -- on those stairs up against

19   that bicycle rack that afternoon.

20             In fact, government counsel told the Court that he is

21   low risk of recidivism, which I pointed out in my papers also.

22   And that is why I too, similar to Ms. Jacob ask the Court to

23   vary downwards on aberrant behavior, 5K2.20.  You know, much

24   is -- what was said about Mr. Sturgeon kind of -- I am

25   repeating myself.  But it was spur of the moment for

1    Mr. Bingert.  He too went to the rally on the Ellipse.  And it
2    was a last-minute decision to go to the US Capitol.  He had no
3    preplanning to go that afternoon.  And what he did that
4    afternoon is such a deviation from his otherwise exemplary
5    life, that it is astonishing.  I mean, I have known Mr. Bingert
6    now for over two years.  And by the way, as the Court heard me
7    say before when he heard about there was an arrest warrant for
8    him just a few weeks after January 6, he actually contacted a
9    lawyer.  He privately engaged a lawyer up in the Philadelphia
10   area and turned himself in there.  It was a little bit after
11   that that I became involved in this case.
12           But since the very beginning of my representation of
13   Mr. Bingert through today -- okay -- everything I have come to
14   know about him and learn about him, shouts out, you know, what
15   were you doing?  I mean, this is aberrant behavior.  This is a
16   classic example of aberrant behavior on behalf of an
17   individual.  He has had all of the benefits and the joys of
18   life before January 6.  And he continues to have some of them
19   afterwards.  But I mean he had a good upbringing, as the Court
20   can tell.  He has loving parents, both of whom are here.  He
21   has friends.  I talked with him about his friends.  He has --
22   he has had a variety of jobs prior to January 6 and also over
23   the past 2 and a half years.  But he has always been
24   industrious.  He has always been hard working since he left
25   home and went to college, he has made his own way in the world.

1    And that is something that he would like to be able to do as

2    soon as possible.  He too, as Ms. Jacob said to the Court,

3    knows that -- she said on behalf of Mr. Sturgeon, there is some

4    sort of punishment coming.  But what is the appropriate

5    punishment in this case?

6         I think the Court has an opportunity here to not only

7    tell Mr. Bingert about what specific deterrence is appropriate,

8    but also to tell the community what, in a sentence, general

9    deterrence is appropriate in this case.  And to send someone

10   like Mr. Bingert to prison for 11-plus years is not the right

11   sentence in this case.  I know this Court is aware of many,

12   many other January 6 sentences in this case where even

13   approaching double digit periods of incarceration were because

14   the defendants in those cases engaged in far more serious

15   conduct than my client.

16        So what I am asking the Court to do -- and by the

17   way, I made another argument for a variance downwards based on

18   the expected conditions at the Bureau of Prisons.  And to be --

19   if the Court read my argument on that, the Bureau of Prisons,

20   as I understand it, officially in early May of this year more

21   or less said COVID is sort of over or back to normal

22   operations.  But I am continuing to hear anecdotally from my

23   clients and members of my clients' family who are incarcerated.

24   That is not exactly true.  There are still restrictions in the

25   BOP because of COVID concerns.  In fact, I think the Court is

1    probably aware that there are some concerns overall in general

2    in the community in our country that there is another strain

3    coming and all of that.  We may well see in the very near

4    future the Bureau of Prisons officially go back to modified

5    operations.

6             So I am asking the Court to consider a departure or a

7    variance -- excuse me -- on that basis also.

8             Your Honor, I think his mother Vanya Bingert would

9    like to address the Court.

10            THE COURT:  Okay.

11            Good afternoon.

12            MS. BINGERT:  Good afternoon, Your Honor.  I wanted

13   to let you know about Craig's childhood and his upbringing.

14   His upbringing.  His upbringing is a religious upbringing, so

15   he was always part of the church, a part of a large family.  My

16   family is a large family.  And out of my three children, Craig

17   was always the most caring to my mom.  And since I moved a year

18   ago, he is the only one out of all of the grandchildren that

19   actually stops by, prays with her and cuts her grass, just to

20   check up on her.  I am actually here visiting this week for my

21   brother-in-law's mom who passed away.  Nobody checked on her in

22   days so they found her dead.  So I fear for my mother that not

23   having Craig in her life is going to be detrimental.

24            She prays with him all of the time.  He probably has

25   four or five Bibles, because she always gives him one.  I said,

 1  mom, he already has a Bible.  And she insists on him staying

 2  close to the Lord and praying.  And he is a good person.  I

 3  remember he worked in landscaping one time.  And he was coming

 4  home from work and there was like a bum under the tree, like a

 5  homeless person.  He said, Mom, I have got to turn around and

 6  just go back in that -- it was a Turkey Hill store.  And got a

 7  sandwich and a drink and offered it to him.  You know and said,

 8  hey, do you need anything?  Most people just pass by and say,

 9  oh, it is another day in life.

10          So also because of all of this, I have a daughter

11  who, you know, doesn't speak to us.  You know, because of, you

12  know, she is ashamed of it and everything.  So Craig has

13  suffered a lot of sorrow for having that.  So he has been

14  punished already enough, with all of this tension.  Because as

15  our family was so close, we lost a lot of people who used to

16  admire him, but now they are not so much.  But our family is so

17  close knit, I have a lot of brothers and sisters that offered

18  to send letters on behalf of Craig about his character.

19          He was never in trouble in school.  I never was

20  called once for him.  The other two, yes, for minor things, but

21  for him, never.  He is the kind of kid, you could just leave

22  him and go take a shower and he would be right there.  The

23  other ones were into things.  He was always a very nice child,

24  a good man.  So I would ask for God to have mercy on you to

25  have mercy on my son for the sake of my mother, his nana, which

1    he loves very much.  He is the greatest part of her life.  And

2    he checks on her.  I am out of state, so I can't physically

3    check on her, but he does make sure that he checks on her.  So

4    I don't want event -- brief event to define his life as a

5    person that he truly is.

6              THE COURT:  Thank you very much.

7              MR. ORENBERG:  Thank you, Judge.  Judge, at the end

8    of my sentencing memo, I ask the Court for a couple of judicial

9    recommendations, that if the Court remands him to the Bureau of

10   Prisons.  In speaking with Mr. Bingert today, he asks me if --

11   well, he is reconsidering his request.  I put in there

12   Allenwood -- the Allenwood facilities.  And he is reconsidering

13   that given the fact where his parents live in a different part

14   of the country now.  So I am asking the Court if I may have or

15   he may have 36, 48 hours to reconsider that request and I can

16   send a --

17             THE COURT:  I will come to that at the end then.

18             MR. ORENBERG:  Okay.  All right.

19             THE COURT:  Give me just a moment here.

20             MS. KLAMANN:  Your Honor, may I be heard on one or

21   two small factors.

22             THE COURT:  Yes.

23             MS. KLAMANN:  Your Honor, defense counsel -- both

24   defense counsel mentioned a number of comparator cases.  And

25   during discussion of those --

1          THE COURT:  I'm sorry.  I can't hear you.

2          MS. KLAMANN:  I'm sorry, Your Honor.  Defense counsel

3   during their allocution mentioned a number of comparator cases,

4   including the Young case, the Creek case, the Sargent case and

5   the Council case and represented to Your Honor that the charges

6   were the same in those cases.  I just want to correct the

7   record that they, in fact, were not.  None of those cases

8   included 1512 or a 1512 conviction, which I believe is

9   significant and a significant difference between this case and

10  those cases.  As Your Honor knows, that conviction is driving

11  the guidelines range here.  And that is very serious conduct.

12          Last, Your Honor, I would just like to briefly

13  address the motion for downward variance, just with respect to

14  COVID 19.  There is no indication that the BOP has upped its

15  restrictions at this point.  I think more importantly as the

16  PSR reflects, Mr. Bingert has not been vaccinated for COVID-19,

17  which is important for Your Honor to consider because

18  essentially Mr. Bingert is asking you to care more about his

19  health than he does.  So we would ask you to deny the motion

20  for a downward variance on the basis of the COVID-19 pandemic

21  for that reason.

22          THE COURT:  Okay.

23          MS. KLAMANN:  Thank you, Your Honor.

24          THE COURT:  All right.  If the defendants would come

25  forward.

1        Was there something else you wanted to say,

2    Mr. Bingert, before I impose sentence?

3              DEFENDANT BINGERT:  No.  No, sir.

4              THE COURT:  Okay.  And Mr. Sturgeon.

5              DEFENDANT STURGEON:  No, Your Honor.

6              THE COURT:  Pursuant to the Sentencing Reform Act of

7    1984 and in consideration of the provisions of 18 USC 3553, it

8    is the judgment of the Court that Craig Michael Bingert is

9    hereby committed to the custody of the Bureau of Prisons for a

10   term of 96 months on Counts 1 and 2, 60 months on Count 3, 12

11   months each on Counts 4 to 6, and 6 months on Count 8, all to

12   run concurrent.

13             In addition, special assessment totaling $385.  The

14   Court finds that either a variance or departure is warranted

15   under the guidelines, because of the law abiding life that the

16   defendant has led, the fact that the departure of the

17   defendant's conduct on this occasion is so unusual that the

18   defendant is not likely to be a repeat offender.  But the

19   seriousness of the offense and the nature of the conduct is

20   such that the Court cannot depart downward more than that, so I

21   am willing to go that far, but not further in this case.

22             As to the Defendant Sturgeon, pursuant to the

23   Sentencing Reform of 1984, in consideration of provisions of 18

24   USC section 3553, it is the judgment of this Court that you,

25   Isaac Steve Sturgeon, are hereby committed to the custody of

1    Bureau of Prisons for concurrent terms of 72 months on Counts 1

2    and 2, 60 months on Count 3, 12 months each on Counts 4, 5, and

3    6, and 12 months on Count 8, all to be served concurrently.

4         Supervised release of 36 months on Counts 1 through

5    3, 12 months on Counts 4 to 6.  And in addition special

6    assessment of $385 in accordance with 18 USC 3013.

7         Again, I find that because of your law abiding life,

8    you're a good person, you're unquestionably not likely to be a

9    repeat offender and your -- I find that a downward departure or

10   variance is justified in this case.  But because of the serious

11   nature of the offense and the terrible thing that happened to

12   our society and our country that day, the Court cannot justify

13   a lower sentence than what I am granting today.

14        I think in connection with Mr. Bingert I failed to

15   say that you also have a period of 3 years of supervised

16   release that is to be part of the sentence.  As to both of you,

17   the terms of supervision I have to give you both this

18   determination to be read that will apply to both of you.  While

19   you are on supervised release, you shall abide the following

20   mandatory conditions of supervised release, as well as all

21   discretionary conditions recommended by the probation office in

22   part D of the sentencing options of the presentence report as

23   to each of you, which are imposed to establish the basic

24   expectations of your conduct while on supervision.

25        Mandatory conditions include:  One, you must not

1    commit another federal, state or local crime.  Two, you must

2    not unlawfully possess a controlled substance.  Three, you must

3    refrain from any unlawful use of a controlled substance.  You

4    must submit to one drug test within 15 days of placement on

5    supervision and at least two periodic drug tests thereafter as

6    determined by the Court.  Four, you must cooperate in the

7    collection of DNA as directed by the probation office.  And,

8    five, you must make restitution in accordance with 18 USC

9    section 3663 and 3663(a) or any other statute authorizing a

10   sentence of restitution.

11           You shall also comply with the following special

12   conditions:  You are ordered to make restitution to the

13   Architect of the Capitol in the amount of $2,000, each of you.

14   The Court will determine that you do not have ability to pay

15   interest and therefore waives interest or penalties on the

16   amount of balance and restitution.  Restitution payment shall

17   be made to the Clerk of the Court, US District Court, District

18   of Columbia for disbursement to the following victim:

19   Architect of the Capitol, Office of the Chief Financial

20   Officer, Ford House Office Building, room H2205B, Washington,

21   DC, 20515 in the amount of $2,000.

22           The Court imposes a fine in each case of $2,000,

23   which is a departure from the guidelines as well.

24           Financial obligations are payable to the Clerk of the

25   Court, US District Court, 333 Constitution Avenue Northwest,

1    Washington, DC.  Within 30 days of any change of address, you

2    shall notify the Clerk of the Court of the change until such

3    time as the financial obligation is paid in full.

4             Probation office shall release the presentence

5    investigation report to all appropriate agencies, which

6    includes the probation office in the approved district of

7    residence in order to execute the sentence of the court.

8    Treatment agency shall return the presentence report to the

9    probation office upon the defendants' completion or termination

10   from treatment.

11            As to each defendant, within 60 days of your release

12   from incarceration, you shall appear before the Court for a

13   reentry progress hearing.  Probation office in the district to

14   which you will be released and supervised will submit a

15   progress report to the Court within 30 days of commencement of

16   supervision.  Upon receipt of the progress report, the Court

17   will determine if your appearance is required.  The Court may

18   allow appearance by either Zoom or telephone, if the defendant

19   wants to waive personal appearance.

20            In light of the unlikelihood of any substance abuse

21   in the future, the Court will not require additional substance

22   abuse testing after release from incarceration.

23            Notice of appeal.  Pursuant to 18 USC section 3742,

24   you have the right to appeal the verdict and the sentence.  If

25   you choose to appeal, you must file any appeal within 14 days

1    after the Court enters judgment.  If you are unable to afford
2    the cost of an appeal, you may request from the Court to file
3    an appeal without cost to you.  As defined in 28 USC section
4    2255, you also have the right to challenge the conviction
5    entered or sentence imposed if new or currently unavailable
6    information becomes available to you or on a claim that you
7    received ineffective assistance of counsel in entering a plea
8    of guilty to an offense or in connection with your sentencing.
9    If you are unable to afford the cost of an appeal, you may
10   request permission from the Court to file an appeal without
11   cost to you.
12             Does any counsel have any objection to the sentence
13   as imposed that have not already been noted on the record,
14   first the government?
15             MS. KLAMANN:  No, Your Honor.
16             THE COURT:  Counsel for Mr. Bingert?
17             MR. ORENBERG:  No, Your Honor.
18             THE COURT:  Counsel for Mr. Sturgeon.
19             MS. JACOB:  Your Honor, I noted in my papers, the
20   objection to the restitution.  But if it needs to be on the
21   record too, that would be the only thing.
22             THE COURT:  Those are overruled.
23             MS. KLAMANN:  Your Honor, I apologize if I misheard
24   you.  I believe with respect to Mr. Sturgeon, you may have said
25   that there -- on Count 8 you were entering a sentence of 12

1    months.  I believe the max that for that --

2              THE COURT:  It is 6 months, yeah.

3              MS. KLAMANN:  -- is 6 months.

4              THE COURT:  And did I say that for -- what did I say

5    for --

6              MS. KLAMANN:  I believe for Mr. Bingert, you did say

7    6 months.

8              THE COURT:  I said 6 months for the other defendant,

9    but for Sturgeon it should be 6.

10             MS. KLAMANN:  Thank you, Your Honor.

11             THE COURT:  I agree that is the max.

12             And 6 months.  Okay.  Now, in terms of Mr. Bingert,

13   what recommendations did you want me to make?

14             MR. ORENBERG:  Your Honor, I did make a judicial

15   recommendation for Allenwood, but my client has asked if he

16   could have a couple of days to think it over, depending upon --

17             THE COURT:  Sure.  You can let me know.

18             MR. ORENBERG:  I can let chambers know.  And also a

19   recommendation --

20             THE COURT:  I will put it on the J and C.

21             MR. ORENBERG:  Correct.  And a recommendation that he

22   be considered for the employment opportunities within the

23   Bureau of Prisons, the occupational programs.

24             THE COURT:  Okay.  You can call my chambers about the

25   other.

1          MR. ORENBERG:  Okay.  Thank you.

2          MS. JACOB:  Your Honor, the recommendation on behalf

3    of Mr. Sturgeon would just be as close to his home in Dillon,

4    Montana as possible.

5          THE COURT:  Okay.  And the government's request

6    regarding defendants' status in the meantime?

7          MS. KLAMANN:  Your Honor, we are not asking for the

8    defendant to be stepped back at this time.

9          THE COURT:  All right.  Okay.

10          The defendants will be given a reporting date then by

11    probation or pretrial or probation or Pretrial Services.

12    Defendants are continued on the same conditions pending

13    reporting date.  All right.  The Court will be in recess.

14          Thank you very much, Counsel.

15          (Proceedings concluded at 6:37 p.m.)

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 12th day of October, 2023.

_____
Sherry Lindsay, RPR
Official Court Reporter